The next matter is U.S. v. Phyllis Pincus and Attorney Wallenstein. Did I pronounce that correct? Yes, Your Honor. Thank you. You have reserved two minutes for rebuttal. That's correct. Good morning, Your Honors. John Wallenstein on behalf of Phyllis Pincus. So this case has two fairly simple issues as I see it, and they're intertwined. The government failed to meet its burden of proving via preponderance that the restitution amount was correct, and we don't challenge any of the other components of Judge Matsumoto's sentence. Ms. Pincus has served her time and is home on supervised release. The restitution amount should be based only on those claims that were actually filed by Andrew Barrett because Barrett had been barred from filing claims, Ms. Pincus knew that, and she was allowing him to file claims from the pharmacy computers. But if you're correct, if the government, in calculating loss, used only the claims that her ex-husband filed when she picked him up when he was at the – he was in housing, right? He was on parole? He was in a halfway house. Halfway house. But that's not where she picked him up from. He was already home by the time he came into the pharmacy. She brought him to her pharmacy knowing he had been convicted of fraud in connection with billing fraudulent claims for medicine. Yes. She brought him to her pharmacy after hours, allowed him to file claims. The government's loss calculation, and there's no question she admitted she knew that him filing any claims, legitimate claims or fraudulent claims, was illegal. All of the claims he filed were illegal. I don't disagree with that. The government's loss calculation was based only on the claims that the government believed he filed that were for fictitious prescriptions. So they weren't real people, and I know they did it based on inventory, and I saw your arguments about how that methodology may not be precisely accurate. But if the government had used all the claims that he actually filed, both the legitimate claims and the fraudulent claims, the loss amount would undoubtedly be a lot higher. Well, it could possibly be higher, I suppose. But I think that the problem here is that their methodology doesn't focus on Andrew Barrett. It focused on essentially an inventory analysis. But is there any evidence that anyone else other than Mr. Barrett, her ex-husband, was filing fraudulent claims? We don't know that. There's no evidence of that. Ms. Pincus strongly suspects that one of her pharmacists was stealing from her possibly by doing this, but that's really not relevant to this issue because there is no proof of it. Well, it's relevant because she didn't have any evidence of that, right? There's no proof of it. Well, the methodology, Mr. Wallenstein, the methodology was based on false claims. And as Judge has pointed out, no one else is alleged to have done false claims. So why wasn't it a sound methodology to come up with what would have been false claims? Because I don't think that the methodology, Judge Annan, was actually based on only false claims. It seems to have been based on an analysis of the inventory saying there's a shortfall. Well, it wasn't inventory. It was what had been not existing inventory. It was what had been purchased and then what had been dispensed. Yes, but that's essentially what I'm referring to as an inventory analysis. You take starting point A, you have 100 units. At the end, you have 50 units. So those 50 must have been the false ones because they're ‑‑ But I think that's the flaw because there were legitimate claims. Remember, Mr. Barrett had no credentials. And I know this is Mr. Campos's point, but Barrett had no credentials. The only way he could actually file claims in those computer systems was to use the credentials of an actual pharmacist employed by the pharmacy. And he did that. And there's no question that that was illegal. It was fraud. And it was very difficult, if not impossible, to determine because he was using other pharmacists' names what claims were being filed by him. Well, yes. Except for this theory. But I think that what they could have done, and this is based on what was in the discovery, that there is video of when he was in the pharmacy. And there's no question that when he was in the pharmacy filing claims, the pharmacy was closed. If it opened at 10 a.m. and she brought him in at 7, he had three hours to do whatever he was doing. Whatever was filed during that three‑hour period was done by him because there was nobody else to do it. But didn't Judge Matsumoto find that the claims weren't timestamped, so that's why that ‑‑ although it might make sense, that was the problem? That is what the government said, and I think ‑‑ I'm not certain that Judge Matsumoto found that specifically, but that was the government's argument at the time of the sentencing hearing. But I think that what they could have done, because they had the video of when he was there, was take that time period, observe him there, and they knew it was before the pharmacy. But they didn't have that video. I thought the evidence below was that the video was not timestamped, and they couldn't identify precisely the times he was there. And also there was a claim that it wasn't just after hours, that he also went during business hours to submit these all ‑‑ 100% of the claims he submitted using her other pharmacist's I.D. were false. And that he did it not just after hours, but that he did it also during times when the pharmacy may have been open, and also that the videos, the video footage that you want the government to use to determine when he's there, doesn't contain timestamps or the timestamps are inaccurate. So it's an issue of timestamps on both ends. Except that we know what time the pharmacy opened. So anything that he filed prior to that time, which would be obvious in the videos, because you can tell when the store is open when it's not. And therefore, anything that was filed by him in that time period could be matched up against the computer systems of the Medicare, Medicaid, whatever the insurers were, to say, well, in that three‑hour period on this particular day, there were 15 claims that were filed. Okay, we know those are now false. Let's put them in that bucket. Just as Judge Amon was asking you, that assumes the claims were accurately timestamped, correct? Well, I'm assuming that the claims were accurately timestamped on the computer end, not necessarily on the video, but on the computer end, and yet the video which was taken prior to the store opening. And you can tell that because the lights go on because other things happen. But if the claims were not accurately timestamped in the computer, where the computer date was, you know, we've heard of computer timestamps being manipulated, right? And if somebody was filing fraudulent claims, that certainly would be something someone could do, correct? Well, I think that the government could have gone through this. I think they took the easy way out by making an estimate. And I think while the case law says that estimates in restitution are appropriate, Judge, but not when you can't actually come up with a more accurate method. That's my point. And your client is willing to risk the fact that if it is an estimate based on 100 percent of the claims he filed, that it actually may be, you know, way higher amount. You know, millions versus what was used. I don't think it's millions, but I don't think that's a result that she wants. But I do think that the government's estimate is incorrect. And I think that it fails, even as it is, it fails to account for certain other things. So, for instance, my point is that it's an inventory analysis, however you describe that. They don't have a starting point. They know the starting date because that's the date he was released from the halfway house. And they know the end date because that's the date they were arrested. So, presumably, anything he did within that time frame is subject to this analysis. But they don't know how much inventory was there when it started. But was it, you know, you make that argument, and obviously you had no burden of proof. Your client had no burden of proof. But that information as to what inventory would have been there was peculiarly in the possession of your client. And why couldn't that have been, that evidence offered to invalidate this methodology if you thought that that was significant? I would say that it had been in the possession of my client up to the time of the arrest when the DEA seized all the computers. And that was the end of any records she had. That is pretty much how I see it. Thank you, counsel. You have reserved two minutes for rebuttal. Good morning. Good morning, and may it please the court. My name is William Campos. I'm an assistant United States attorney in the Eastern District of New York, arguing on behalf of the government in this case. Here, the district court properly exercised its discretion and used an appropriate methodology to arrive at a reasonable estimate of the amount of restitution the defendant owed. Because of the nature of the fraud and the nature of the crime, the defendant's ex-husband, Mr. Barrett, had to use the credentials of another pharmacist so that when he was submitting claims, both fake claims and claims for pills that were actually dispensed, there's unfortunately no way of really pinpointing it with the degree of precision that counsel suggests. Why not? I mean, Klein has pointed out that there would have been video that showed the defendant entering and the defendant leaving. And why couldn't you have figured out what all the claims were during that period, and that would have been a more precise analysis? What precluded you from doing that?  Because unfortunately, Your Honor, there are claims, and the claims themselves, we know the dates of those claims. But those claims are not a time stamp. There is video, and there is outside video and inside video. One of those videos were time stamped. The other set of videos were not. So only one set of videos were time stamped, not the others? Correct. But the problem is that you can't link up the claim to a time-stamped video. You couldn't – the dates, sure, but not the times. And that's why it was – So you wouldn't have known if a claim were filed in the morning when the other pharmacists were there or in the early afternoon when other pharmacists were there? Is that the issue? That's correct, Your Honor. That's exactly correct. So instead of taking 100 percent of the claims that Andrew Barrett submitted, we tried to find out the claims that he submitted for fake claims. He's the only one submitting fake claims. So we did the invoice reconciliation. Why doesn't your adversary make a point, though, about the fact that the analysis didn't take into account that there may have at the time been existing inventory? There may have been. There may have been. But there's no evidence that there was any inventory. And just – this is not in the record, but it's a business that brings – this is not a warehouse. It doesn't have huge amounts of inventory. This is a pharmacy where people come in. You want to minimize the amount of time – from a business perspective, you want to minimize the amount of time that the pills are on the shelves. Yes, there could have been inventory, but there was simply no evidence of it. So there was nothing to use. You didn't have records. Counsel pointed out that the computers were all taken, and his client couldn't have considered it. Would that information have been on the computers that you seized? What was on the shelves? No, because what we could see was what was purchased and what was claimed to have been dispensed. That's what we could see. If you were to use, instead of using only the claims that he submitted for fake patients, patients who never received actual medicines versus the ones he prescribed for real patients, which he wasn't authorized to – not prescribed to fill. I misspoke. But if you were to use 100 percent of the claims he submitted because he used somebody else's credentials, would that figure have been substantially higher? I mean, did you ever get – Would it have been higher? We expect that it would have been higher. Could I say that it would have been substantially higher? I don't know, because I don't know exactly how many claims he submitted for real patients with real pills, unfortunately. And based on that analysis, the district court made its findings that it was a conservative estimate, and consequently that was the number that was used. And the law doesn't require precision, correct? I mean, there – in many areas of fraud, the courts are left to estimate, do a best estimate of what the fraud amount was. Correct, Your Honor. The requirement is that when, in the absence of being able to determine with precision the restitution amount, that a reasonable, appropriate approximation can be made. And that's what we attempted to do here. And if there are no further questions, we'll rest on our papers. Seeing none, thank you, counsel. Attorney Wallerstein, you have reserved your full two minutes for rebuttal. I have, but Mr. Campos and I have been arguing about this case for the last five years. Oh, what's two more minutes, counsel? What's two more minutes is right, but I don't think that I really have anything to say beyond what I said in my original argument. There's no point in reiterating that. I'm sure that the court has heard it. So unless the court has questions, I think that's it for me. Seeing none, thank you. Thank you, both sides, for a well-argued case. That concludes – we will reserve decision on the matter.